WINTERS v. MILLER.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—EVIDENCE
—SUFFICIENCY.

In proceedings under the workmen's compensation act by
an injured employee, where defendant sought to avoid
liability on the ground that at the time of the injury
plaintiff was working for a partnership consisting of de-
fendant and another with whom he had an agreement
to share profits, the finding by the department of labor
and industry that no partnership existed, *held*, supported
by competent evidence.

Certiorari to Department of Labor and Industry.
Submitted January 23, 1924.      (Docket No. 122.)
Decided July 24, 1924.

LeRoy Winters presented his claim for compensa-
tion against Severene Miller for an accidental injury
in defendant's employ.   From an order awarding com-
pensation, defendant and the Employers' Liability
Assurance Corporation, Limited, insurer, bring cer-
tiorari.   Affirmed.

*Frederick T. Witmire,* for appellants.

STEERE, J.   Defendants seek reversal of an award
to plaintiff by the commission of the department of
labor and industry for the loss of his left index finger
in an industrial accident while working as a sawyer
cutting lumber in a mill found by the commission to
have been operated by defendant Severene Miller.
The question involved is whether plaintiff was work-
ing for Miller personally, who had elected to come
under the compensation act, or for a claimed partner-
ship of Miller & Tolman.   The mill where the accident

On right and extent of review of findings of industrial accident
commission, see note in L. R. A. 1917D, 186.

occurred was located at Sands in Marquette county, and owned by the Sands Lumber Company of South Bend, Indiana. It had been shut down much of the time for several years and was out of repair. In the fall of 1922 Miller, who had previously operated the mill under a contract with the Sands Lumber Company, wrote the company offering to get out the logs from certain timber standing available and saw them at the mill for $20 per thousand. Defendant's offer was accepted and Miller at first sublet the job to a man named Fisher at $13 a thousand, who soon abandoned it. Miller made some repairs upon the mill, and there is a suggestion in the record that he had some kind of interest in it as he and his brother operated it for a time in cutting lumber enough as he states "to build the building," only the two operating the mill. In the fall or early winter, about the beginning of 1923, Miller resumed operations on this contract and made some kind of arrangement with a man by the name of Tolman, who had before worked for him and had a team, to get out logs for the mill on a basis of a division of profits under Miller's contract. Miller's statement of their agreement is:

"I told him that if he would stay, he wanted to stay for the rest of the winter, and I told him if he would stay and help me out I would give him half of whatever we produced."

Tolman's work was to get out and bring the logs to the mill, which Miller was to operate. A sawyer was wanted in the mill and Tolman found Winters who claimed to be a head sawyer and engaged him for that purpose, telling him, as Winters testified, "the mill was being operated by himself and Mr. Miller." When they went to the mill the next morning, Miller talked it over with him, told him how he wanted the logs sawed and what kind of lumber to make. To get him started Miller ran the saw for a short time

and then turned it over to plaintiff who ran it for a few hours when his hand came in contact with the saw and his finger was cut off near the first joint. His statement of how the accident occurred is as follows:

"I went to adjust the die pin on the saw and I put on a wrench and the wrench slipped and moved my hand into the moving saw."

Of his employment there and attending conditions, Miller testified in part as follows:

"*Q.* Was Leroy Winters working for you in January, 1923?

"*A.* Yes, sir.

"*Q.* And he was injured at your plant?

"*A.* At the plant owned by the Sands Lumber Company of South Bend, Indiana.

"*Q.* And what connection did you have with the mill?

"*A.* I was operating the mill for them.

"*Q.* In what way?

"*A.* I had a contract at one time three years ago, I think, and we worked for a while and then they shut us down until last fall, about the first of October. Then they wanted me to start again but they did not really make a new contract. I don't know whether you would call it working on contract or not.

"*Q.* Did you make a new contract with them?

"*A.* No, I did not.

"*Q.* What was your copartnership with Tolman?

"*A.* We were to divide the profits after.

"*Q.* Did you make any written agreement with the Sands Lumber Company?

"*A.* I wrote them and told them I would try it at the $20 a thousand but I would not guarantee to do it at that. I would do it if I could.

"*Q.* What did Tolman have to do with that?

"*A.* He had nothing to do with the Sands Lumber Company."

No written memorandum of partnership was ever made between them or filed with the county clerk as

the law requires, neglect of which is a misdemeanor, nor was any notice to that effect ever given to the commission until April 3, 1923, after notice of claim for compensation had been served upon Miller, and the attorney for defendant insurance company wrote the commission denying liability, followed by a report of the accident, dated April 4, 1923, signed, "Severene Miller, and Sam Tolman, by Severene Miller, Mgr."

It is fairly inferable from his testimony that Miller was operating under the same contract when this accident occurred, in 1923, as when he elected to operate under the workmen's compensation act at Sands as an employer of labor, in 1920, and placed the compensation insurance which he has since carried with defendant Employers' Liability Insurance Corporation, Ltd. He testified in this case (in 1923) that he had a contract with the Sands Lumber Company "three years ago" which was shut down after working for a time and when they wanted him to start again he made no new contract, and Tolman "had nothing to do with the Sands Lumber Company."

Even if he did personally sublet or assign that contract to a partnership composed of himself and Tolman organized to perform that contract, we are not prepared to hold that he could by so doing escape liability under the compensation act as amended in 1921. But, as often heretofore pointed out, the compensation law makes the findings of fact by the commission acting within its powers conclusive, and this court may not disturb them if there is in the record direct or inferential evidence tending to sustain them. Courts recognize that persons can participate in the profits of a joint venture or contract without becoming partners. The terms of this alleged partnership are too meager and uncertain to impel the commission to find as a matter of law that a legal copartnership is conclusively shown. There is evidence from which the

negative may be inferred. The commission found no partnership existed and its finding will not be disturbed.

The award will stand affirmed.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.